# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF OKLAHOMA

**JUSTIN MORRIS, as administrator for the Estate of George Morris**

**Plaintiff,**

**v.**

**KEITH L. HUMPHREY,** *et al.,*

**Defendants.**

## MOTION FOR SUMMARY JUDGMENT WITH
## BRIEF IN SUPPORT BY JANSEN IDLETT

**DEVAN A. PEDERSON, OBA # 16576**
**Assistant Attorney General**
**Oklahoma Attorney General's Office**
**Litigation Division**
**313 NE 21st Street**
**Oklahoma City, Oklahoma 73105**
**Telephone: (405) 521-3921  Facsimile: (405) 521-4518**
**Devan.Pederson@oag.ok.gov**
*Attorney for Defendants, Jansen Idlett and*
*Department of Public Safety ex rel*
*Oklahoma Highway Patrol*

**October 1, 2014**

# TABLE OF CONTENTS

**TABLE OF CONTENTS**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

**TABLE OF AUTHORITIES**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

**MOTION FOR SUMMARY JUDGMENT WITH BRIEF IN SUPPORT BY JANSEN IDLETT**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

**I.      STATEMENT OF THE CASE**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

**II.     STATEMENT OF MATERIAL FACTS**. . . . . . . . . . . . . . . . . . . . . . . . . . 2

**III.    SUMMARY JUDGMENT STANDARD**. . . . . . . . . . . . . . . . . . . . . . . . . 11

**IV.     USE OF FORCE UNDER THE FOURTEENTH AMENDMENT**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

**V.      USE OF FORCE UNDER THE FOURTH AMENDMENT**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

          **A.      General Principles**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

          **B.      The Use of Force in the Case at Bar**. . . . . . . . . . . . . . . . . . . . 14

                    **1.      Taser Cycles**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

                    **2.      Handcuffing**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

                    **3.      Leg Restraints**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

                    **4.      Miscellaneous Injury Reference**. . . . . . . . . . . . . . . . . 21

                    **5.      No Positional Asphyxia**. . . . . . . . . . . . . . . . . . . . . . . . 23

**VI.     USE OF FORCE UNDER THE OKLAHOMA CONSTITUTION**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

**VII.    DELIBERATE INDIFFERENCE TO MEDICAL NEED**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

**VIII.  QUALIFIED IMMUNITY**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

    **A.**    **Federal Constitutional Claims**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

    **B.**    **State Constitutional Claims**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

**CONCLUSION**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

**CERTIFICATE OF SERVICE**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

# TABLE OF AUTHORITIES

## CASES

*Abbott v. Sangamon County, Ill.*,
705 F.3d 706 (7th Cir. 2013). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Bosh v. Cherokee County Bldg. Authority*,
305 P.3d 994 (Okla. 2013). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Brosseau v. Haugen*,
543 U.S. 194 (2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Bryson v. Oklahoma County Detention Center*,
261 P.3d 627 (Okla. App. 2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23, 24, 25

*Carpenter v. Gage*,
686 F.3d 644 (8th Cir. 2012). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Cruz v. City of Laramie, Wyo.*,
239 F.3d 1183 (10th Cir. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Draper v. Reynolds*,
369 F.3d 1270 (11th Cir. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Fleming v. City of Bridgeport*,
935 A.2d 126 (Conn. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*G.M. ex rel. B.M. v. Casalduc*,
982 F. Supp. 2d 1235 (D.N.M. 2013). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 21

*Graham v. Connor*,
490 U.S. 386 (1989). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 12, 13, 14

*Gunter v. Township of Lumberton*,
535 Fed. Appx. 144 (3rd Cir. 2013). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 23, 26

*Harlow v. Fitzgerald*,
457 U.S. 800 (1982). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Hinton v. City of Elwood, Kan.*,
997 F.2d 774 (10th Cir. 1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Hulls v. Williams*,
29 P.2d 582 (Okla. 1934). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Koch v. City of Del City*,
660 F.3d 1228 (10th Cir. 2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Los Angeles County, California v. Rettele*,
550 U.S. 609 (2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Mann v. Taser Int'l, Inc.*,
588 F.3d 1291 (11th Cir. 2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Mayard v. Hopwood*,
105 F.3d 1226 (8th Cir. 1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Mecham v. Frazier*,
500 F.3d 1200 (10th Cir. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 17, 18, 19

*Moresi v. State Through Dept. of Wildlife and Fisheries*,
567 So.2d 1081 (La. 1990). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Neal v. Donahue*,
611 P.2d 1125 (Okla. 1980). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Nelson v. McMullen*,
207 F.3d 1202 (10th Cir. 2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Novitsky v. City of Aurora*,
491 F.3d 1244 (10th Cir. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Pearson v. Callahan*
129 S.Ct. 808 (2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Pino v. Higgs*,
75 F.3d 1461 (10th Cir. 1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Plumhoff v. Rickard*,
134 S.Ct. 2012 (2014). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 19, 21

*Robbins v. Oklahoma*,
519 F.3d 1242 (10th Cir. 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Ryburn v. Huff*,
132 S.Ct. 987 (2012). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Saucier v. Katz*,
533 U.S. 194 (2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Savannah v. Collins*,
547 Fed.Appx. 874 (10th Cir. 2013). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Scott v. Harris*,
550 U.S. 372 (2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 13

*Thomson v. Salt Lake County*,
584 F.3d 1304 (10th Cir. 2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Tiscareno v. Anderson*,
421 Fed.Appx. 842 (10th Cir. 2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Tiscareno v. Anderson*,
639 F.3d 1016 (10th Cir. 2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Turnbow v. Ogden*,
386 Fed.Appx. 749 (10th Cir. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Washington v. Berry*,
55 P.3d 1036 (Okla. 2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Williams v. Sandel*,
433 Fed.Appx. 353 (6th Cir. 2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

**STATUTES**

Article 2, Section 30 of the Oklahoma Constitution. . . . . . . . . . . . . . . . . . . . . 1, 23, 24, 25

Okla. Const. art. 2, § 9. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

Okla. Stat. tit. 51, § 155. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

# RULES

Fed. R. Civ. P. 8. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

JUSTIN MORRIS, as administrator for )
the Estate of George Morris, )
                                 )
              Plaintiff )
                                 )
vs.                                )     Case No. 14-CIV-00497
                                 )
KEITH L. HUMPHREY, et al.,       )     Cleveland County District Court
                                 )     Case No. CJ-2014-490
             Defendants. )

**MOTION FOR SUMMARY JUDGMENT**
**WITH BRIEF IN SUPPORT BY JANSEN IDLETT**

### I.    STATEMENT OF THE CASE

Justin Morris ("Morris") has filed this civil action as the administrator for the Estate of George Morris. Morris has named as defendants, Jansen Idlett ("Idlett" or "Trooper Idlett"), the Oklahoma Highway Patrol ("OHP"), Norman Police Officers Larry Shelton ("Shelton" or "Officer Shelton"), Aaron Lancaster ("Lancaster" or "Officer Lancaster"), and Jonathan Hicks ("Hicks" or "Officer Hicks"), and the City of Norman. Morris's claims against Keith L. Humphrey and Norman Police Department have been previously dismissed by the Court. See Orders of July 11, 2014 (docs. 31, 32, and 33).

Morris's claim against Trooper Idlett is that Idlett – along with Norman Police Officers Shelton, Lancaster, and Hicks – used excessive force in taking George Morris ("G. Morris") into custody in violation of Article 2, Section 30 of the Oklahoma Constitution and in violation of the Fourth and Fourteenth Amendments of the federal constitution. Petition

at pp. 12 - 13, ¶¶ 59 - 60. Trooper Idlett now asserts the defense of qualified immunity and moves for summary judgment on all claims against him.

## II.     STATEMENT OF MATERIAL FACTS

1.      Hours before the incident which is the subject of this case, G. Morris had ingested methamphetamine, stripped off his clothes, tore up a room in his elderly mother's home, and broke out of one of the windows in the home. He then drove off in his mother's vehicle completely naked. *Source*: Oklahoma City Police Department Crime Report dated 12/15/2012, attached hereto as Exhibit No. 1; Report of Autopsy (showing positive toxicology test for methamphetamine and cause of death as atherosclerotic cardiovascular disease and methamphetamine abuse), attached hereto as Exhibit No. 2. Eventually, Morris made his way to the southbound lanes of I-35 where he rammed another vehicle with his car. He then pulled over, accused the other driver of hitting him, and ran off on foot– still naked. *Source*: Statements of Charles and Stacey Oleo, attached hereto as exhibits 3 and 4, respectively.

2.      In the early morning hours of Sunday, December 16, 2012 Trooper Jansen Idlett was on duty patrolling Cleveland and McClain Counties. He knew nothing of Morris's aforementioned exploits. *Source*: Trooper Idlett's dash camera video ("Video"), filed conventionally by the Norman officers in their motion for summary judgment on August 25, 2014. See doc. 39, Notice of Conventional Filing.

3.      At time marker 20:16 on the video, the dispatcher radios Trooper Idlett to

2

request that he call her on his cell phone. At time marker 20:42, Trooper Idlett pulls over and calls the dispatcher. The dispatcher tells him that there is a report of an auto accident on I-35 around Robinson, and that one of the drivers is naked. At time marker 20:58, Trooper Idlett advises the dispatcher that he is at Robinson and that he does not see anything. He then notices flashing lights to the north and so advises the dispatcher. At time marker 21:12 he resumes traveling northbound on I-35. Idlett Statement, Exhibit 5; Video, conventionally filed.

4.      At time marker 22:30, Trooper Idlett exits his vehicle and looks over the top of the center barrier. *Source*: Idlett Statement, Exhibit 5; Video, conventionally filed. When looking over the top of the center barrier, Trooper Idlett observes a naked white male (G. Morris) lying on the inside shoulder of the interstate on the southbound side. *Source*: Idlett Statement, Exhibit 5; Video, conventionally filed.

5.      There is no way that G. Morris could have gotten to the inside shoulder of the interstate on the southbound side on foot without crossing three lanes of traffic. *Source*: Idlett Statement, Exhibit 5.

6.      Trooper Idlett could see that Officer Lancaster had already used his taser because he could see that the leads had been fired. *Source*: Idlett Statement, Exhibit 5.

7.      The two Norman officers were giving G. Morris verbal commands to put his hands behind his back, but G. Morris was not complying. Officer Shelton tried grabbing Morris's arm to handcuff him but Morris resisted, refusing to allow his arms to be placed

behind his back. *Source*: Idlett Statement, Exhibit 5.

8.      At time marker 22:38, Trooper Idlett jumps over the center barrier wall and immediately begins trying to grab Morris's arm. Trooper Idlett and Officer Shelton attempt to place Morris into handcuffs, but he continues to resist and they are unable to place the handcuffs on him. *Source*: Idlett Statement, Exhibit 5; Video, conventionally filed.

9.      Even when an officer has greater strength than an arrestee, it is often very difficult to pull the arrestee's arm out from under him if he is on his stomach and pulling his arm in towards his body – as Morris was doing in this situation. This is especially true when the arrestee has been using amphetamines. *Source*: Idlett Statement, Exhibit 5.

10.      Officer Lancaster could see that Officer Shelton and Trooper Idlett were having great difficulty handcuffing Morris. Officer Lancaster told them that he was going to cycle his taser again. At approximately the 23:10 marker on the video, Officer Shelton and Trooper Idlett released Morris and Officer Lancaster cycled his taser. One of the leads of the taser had come out of Morris's body and was lying on the pavement. However, the taser did momentarily stop Morris from resisting during the period in which the taser was cycling. *Source*: Idlett Statement, Exhibit 5; Video, conventionally filed.

11.      As soon as the taser finished cycling, Officer Shelton, Officer Hicks, and Trooper Idlett again began attempting to handcuff Morris. This occurred at approximately the 23:18 time marker on the video. Officer Shelton, Officer Hicks, Officer Lancaster, and Trooper Idlett had to wait for the taser to finish cycling before touching Morris again or else

they could have been adversely affected by the taser's electricity. *Source*: Idlett Statement, Exhibit 5; Video, conventionally filed.

12.    Officer Shelton, Officer Hicks, Officer Lancaster, and Trooper Idlett were still unable to handcuff Morris. They could not pull both of his arms behind his back long enough to get the handcuffs on him. Morris's muscle tone was very rigid. He did not comply with any verbal orders and did not seem to feel anything or realize that he was injured and naked. During this time Morris began screaming in a very violent tone of voice "shoot me." Morris was also kicking aggressively during this time and began pushing himself towards the fast lane of Interstate 35. The shoulder in this area is approximately 13 feet, 8 inches wide. Morris made it partially over the white line separating the shoulder from the fast lane of traffic. The fact that Morris was able to make it from the center barrier wall to the white line separating the shoulder from the highway shows how forcefully he was struggling. *Source*: Idlett Statement, Exhibit 5; Video, conventionally filed.

13.    As he was going into the highway, Officer Shelton and Trooper Idlett grabbed Morris's arms to stop him from going all the way into the lane of travel. At this time Officer Lancaster used his taser in drive stun mode in an attempt to gain control of Morris. *Source*: Idlett Statement, Exhibit 5.

14.    After this third taser use, Officer Shelton, Officer Hicks and Trooper Idlett continued to trying to handcuff G. Morris. Officer Hicks attempted to use his baton as a pry bar to pull G. Morris's arm out from under him. *Souce*: Affidavit and attached interview of

Jonathan Hicks, attached hereto as Exhibit 6 and previously filed as doc. 41-2. Finally, at approximately the 24:30 marker on the video, Officer Shelton and Trooper Idlett were able to get handcuffs on Mr. Morris's right hand first and then on his left hand. Morris continued to resist while being handcuffed. *Source*: Idlett Statement, Exhibit 5; Video, conventionally filed.

15.    By the time Morris was handcuffed, he had cuts and scrapes on his body and was bleeding. It appeared to Trooper Idlett that Morris's injuries were from his violent thrashing, fighting, and dragging himself along the pavement. *Source*: Idlett Statement, Exhibit 5.

16.    Officer Lancaster's first use of the taser occurred prior to Trooper Idlett's arrival because when Trooper Idlett arrived he could see that the leads had already been deployed from Officer Lancaster's taser. *Source*: Idlett Statement, Exhibit 5.

17.    The police officer who can be seen arriving in his patrol unit at time marker 22:48 is Officer Hicks. *Source*: Idlett Statement, Exhibit 5; Video, conventionally filed.

18.    As soon as Morris was handcuffed, at time marker 24:30, Trooper Idlett confirmed with the Norman officers that someone had requested medical assistance for Morris. *Source*: Idlett Statement, Exhibit 5.

19.    At 24:46, Trooper Idlett radios the dispatcher that Morris is in custody. Immediately thereafter, Trooper Idlett observes that Morris is still kicking and pushing with his feet and legs. Because Morris had previously tried to push himself into the fast lane of

I-35, Trooper Idlett decides to retrieve his leg restraints and place them on Morris. *Source*: Idlett Statement, Exhibit 5; Video, conventionally filed.

20.     At 25:36, Trooper Idlett jumps back over the concrete barrier to retrieve leg restraints from his vehicle. After retrieving the leg restraints, Trooper Idlett went back to Morris and placed them on his ankles. At no point were the leg restraints ever connected to the handcuffs or to anything else other than Morris's ankles. *Source*: Idlett Statement, Exhibit 5; Video, conventionally filed.

21.     At no time during the entire incident did Trooper Idlett ever place his body weight on Morris's back. At no time did Trooper Idlett ever observe the Norman Officers placing their weight on Morris's back. *Source*: Idlett Statement, Exhibit 5.

22.     At no time did Trooper Idlett deliver any strikes, blows, kicks, or stomps of any kind to Morris. At no time did Trooper Idlett observe the Norman Officers delivering any strikes, blows, kicks, or stomps of any kind to Morris. *Source*: Idlett Statement, Exhibit 5.

23.     At some point after Trooper Idlett placed the leg restraints on Morris's ankles, he placed his hand on Morris's back to feel his heart beat. When he did this, he could feel Morris's heart beating very rapidly. Trooper Idlett could also see and feel G. Morris breathing. G. Morris was also moaning during this time. When Trooper Idlett placed his hand on G. Morris's back, he did not apply any pressure and he certainly did not put any of his body weight on G. Morris's back. *Source*: Idlett Statement, Exhibit 5.

24.     At the 27:08 marker on the video, the emergency lights from the first

responders can been seen as the first responders approached the site. At the 28:56 marker, the first responders arrive on scene. *Source*: Idlett Statement, Exhibit 5; Video, conventionally filed.

25.     The speed limit at the location where Morris was taken into custody was 60 miles per hour. *Source*: Idlett Statement, Exhibit 5.

26.     Trooper Idlett has never received formal training in the use of tasers and he does not carry a taser. The Morris incident was the first time that Trooper Idlett had assisted other officers on an occasion in which a taser was used. *Source*: Idlett Statement, Exhibit 5; Video, conventionally filed.

27.     At the time of Officer Lancaster's taser use – on the two occasions which Trooper Idlett observed – Morris was already on the ground. *Source*: Idlett Statement, Exhibit 5; Video, conventionally filed.

28.     Officer Lancaster's two uses of his taser which Trooper Idlett observed had less probability of causing injury to Morris than other methods of gaining compliance such as: (1) delivering physical strikes to Morris's body with hands, feet, or batons; (2) attempting to slow the blood flow to Morris's brain by grabbing him around the neck; or (3) shooting Morris. *Source*: Idlett Statement, Exhibit 5; Video, conventionally filed.

29.     The entire time that Trooper Idlett was stopped on the side of the interstate where the Morris incident occurred, the situation was rapidly developing and dangerous. *Source*: Idlett Statement, Exhibit 5; Video, conventionally filed.

30. During the entire time that Trooper Idlett was stopped on the side of the interstate, Morris posed a threat of getting into the roadway, resuming his fight with the officers, and endangering innocent motorists. Even once he was handcuffed, G. Morris continued to struggle. *Source*: Idlett Statement, Exhibit 5; Video, conventionally filed.

31. Even after Morris took a break from struggling, there was no way to know if he would resume his attempts to fight, escape, crawl or roll into traffic. *Source*: Idlett Statement, Exhibit 5.

32. At no time after Morris was handcuffed was he left alone. At least one officer constantly monitored him until the first responders arrived and began treating him. At no time prior to the first responders' arrival did Trooper Idlett observe Morris stop breathing or hear anyone state that Morris had stopped breathing. *Source*: Idlett Statement, Exhibit 5; Video, conventionally filed.

33. It is not safe to be stopped in the inside shoulder or in the fast lane of an Interstate highway after dark. There is always the risk of being struck by an intoxicated or inattentive driver. It was important for the law enforcement officials to get Morris into custody so that he could be taken by an ambulance as soon as possible so that they – and Morris -- could get out of the inside shoulder of the highway. *Source*: Idlett Statement, Exhibit 5; Video, conventionally filed.

34. Shortly after the incident, Morris had a blood level of 0.55 mcg/mL of methamphetamine. *Source*: Report of Autopsy, Exhibit 2.

35. Morris's autopsy report showed "significant coronary artery disease" including 70% occlusion of one of his coronary arteries and 20% occlusions on two others. *Source*: Report of Autopsy, Exhibit 2.

36. Morris's death from cardiac ischemia resulted from "[t]he combination of the coronary artery disease, methamphetamine abuse, and exertion associated with the physical activity of the police interaction." *Source*: Report of Autopsy, Exhibit 2.

37. Asphyxia played no role in Morris's death. *Source*: Report of Autopsy, Exhibit 2.

38. Based on the video, sixty-two vehicles passed the point where Trooper Idlett and the Norman Officers were struggling with Mr. Morris from the time that Trooper Idlett stopped his unit to the time that he retrieved his leg irons. This was a time period of approximately three minutes and twenty-four seconds. Vehicles continued to pass this point at approximately the same rate until the first responders arrived. *Source*: Video, conventionally filed.

39. At all times during his encounter with G. Morris, Trooper Idlett was acting in good faith in the course and scope of his employment as a Highway Patrol Trooper for the Oklahoma Highway Patrol division of the Department of Public Safety. *Source*: Idlett Statement, Exhibit 5; Video, conventionally filed; Petition at ¶ 61 (doc. 1-4) ("The actions of Idlett were taken within the scope of his employment"); Answer of State of Oklahoma ex rel. Department of Public Safety at ¶ 6 (doc. 15) ("[OHP] admits that at the time of Trooper

Idlett's contact with Plaintiff's decedent Trooper Idlett was acting under color of state law and that he was acting in good faith within the course and scope of his employment with the Oklahoma Department of Public Safety.").

### III.    Summary Judgment Standard

When a defendant asserts the defense of qualified immunity, the burden is on the plaintiff to establish that (1) the defendant has violated a constitutional right and that (2) the right was clearly established at the time of the defendant's unlawful conduct. *Nelson v. McMullen*, 207 F.3d 1202, 1206 (10th Cir. 2000). In this case, Morris can establish neither.

### IV.    Use of Force Under the Fourteenth Amendment

All claims that law enforcement officials have used excessive force in the course of a seizure are properly analyzed under the Fourth Amendment's "objective reasonableness" standard, rather than under the Fourteenth Amendment's substantive due process standard. *Graham v. Connor*, 490 U.S. 386, 395 (1989). The Fourth Amendment is not limited to criminal cases, but applies whenever the government takes a person into custody against his will. *Pino v. Higgs*, 75 F.3d 1461, 1467 (10th Cir. 1996). Thus, Morris's allegations that the officers' seizure of G. Morris is actionable under the Fourteenth Amendment is without merit and must be dismissed.

### V.    Use of Force Under the Fourth Amendment

### A.    General Principles

Excessive force claims are evaluated under the Fourth Amendment's "objective

reasonableness" standard. *Graham v. Connor*, 490 U.S. 386, 388 (1989). The question of "objective reasonableness" is a question of law for the court. *Scott v. Harris*, 550 U.S. 372, 381 n. 8 (2007). Where the historical facts are uncontroverted, objective reasonableness is *not* a question for the jury. *Mecham v. Frazier*, 500 F.3d 1200, 1203 (10th Cir. 2007). Fourth Amendment jurisprudence has long recognized that "the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Graham* 490 U.S. at 396. Similarly, the right to use physical coercion also exists when the justification for the seizure is the exercise of an officer's community caretaking function. *See Novitsky v. City of Aurora*, 491 F.3d 1244, 1253-54 (10th Cir. 2007) (officers may use force during non-investigatory community caretaking seizures). Whatever the justification for making a seizure, force may be used so long as it is "reasonable." *See Scott*, 550 U.S. at 382 (rejecting "rigid preconditions" for the use of deadly force and emphasizing the Fourth Amendment's "reasonableness" test).

Determining whether the force used to effect a particular seizure is "reasonable" under the Fourth Amendment requires the court to carefully balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake. *Graham*, 490 U.S. at 396. The court must judge the "reasonableness" of a particular use of force from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. *Id.* Reasonableness does not require that officers act flawlessly. Not every push or shove, even if it may later seem unnecessary

in the peace of the judge's chambers violates the Fourth Amendment. *Id.* The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation. *Id.* at 396-97. The question is whether the totality of the circumstances justifies the particular use of force. *Thomson v. Salt Lake County*, 584 F.3d 1304, 1313 (10th Cir. 2009).

The Supreme Court is very reluctant to limit an officer's use of force when the government's justification for the use of force is protecting the public from danger. *See e.g. Scott*, 550 U.S. at 383 (holding that officer did not violate the Fourth Amendment by ramming a reckless driver off the road at high speed in order to protect "other civilian motorists"); *Plumhoff v. Rickard*, 134 S.Ct. 2012 (2014) (officers did not violate the Fourth Amendment by shooting a reckless driver 15 times in order to protect the public from the risk posed by his flight).

Judges should be "cautious about second-guessing a police officer's assessment, made on the scene, of the danger presented by a particular situation." *Ryburn v. Huff*, 132 S.Ct. 987, 991-92 (2012). *See also Brosseau v. Haugen*, 543 U.S. 194 (2004) (Court would not second-guess officer's decision to use deadly force to end what officer perceived as public safety risk even where magnitude of risk was debatable); *Est. of Turnbow v. Ogden*, 386 Fed.Appx. 749 (10th Cir. 2010) (unpublished) (same); *Los Angeles County, California v. Rettele*, 550 U.S. 609 (2007) (a reasonable mistake about dangerousness of suspect did not

violate Fourth Amendment where police executing search warrant at wrong address ordered respondents out of bed naked and held them at gunpoint).

### B.     The Use of Force in the Case at Bar

Because the test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application, its proper application requires careful attention to the facts and circumstances of each particular case to determine whether the "nature and quality of the force used" is justified by the "governmental interest at stake." *See Graham*, 490 U.S. at 396. Here, the "nature and quality of the force used" (three taser cycles, handcuffing, and ankle shackling) was minimal. No counterstrikes, kicks, or blows of any kind were used. Material Fact No. 22. On the other hand the "governmental interest at stake" (protecting innocent motorists, the officers, and G. Morris himself) was great. The entire incident occurred on the shoulder and partially into the traffic lane of a busy interstate highway at night.

In his removed petition, Morris references five uses of force. Morris's first three allegations regarding force relate to Officer Lancaster's three uses of his taser. Petition at ¶¶ 16 - 18. Morris's fourth reference to force relates to Trooper Idlett's and Officer Shelton's placing G. Morris in "hand restraints." Petition at ¶ 18. Morris's fifth allegation of force relates to Trooper Idlett's placing leg restraints on G. Morris. *Id.* These five uses of force are the only uses of force referenced in Morris's removed petition. As demonstrated below, each use of force was reasonable because, in each instance, the governmental interest in using

force outweighed G. Morris's interest in freedom from the magnitude of force used.

### 1. Taser Cycles

Morris does not allege that Trooper Idlett had anything to do with Lancaster's initial taser firing. In fact, the first firing of the taser occurred prior to Trooper Idlett's arrival. Material Fact No. 6. Therefore, no claim against Trooper Idlett for Lancaster's first taser firing can be viable. *See Savannah v. Collins*, 547 Fed.Appx. 874, 876 (10th Cir. 2013) (unpublished) (plaintiff must show that the officer had the opportunity to intervene but failed to do so).

The next two taser cycles occurred after Trooper Idlett arrived. At time marker 22:24 on the in-car video, Trooper Idlett parks next to the center barrier on the northbound side of the interstate to see why the Norman officers are stopped. He exits his vehicle and looks over the top of the center barrier. He sees a naked white male (George Morris) lying on the inside shoulder of the interstate on the southbound side. Material Fact No. 4. He reasonably believes that there is no way that G. Morris could have gotten to the inside shoulder of the interstate on the southbound side on foot without crossing three lanes of traffic. Material Fact No. 5. Trooper Idlett sees that Officer Lancaster had already used his taser because he sees that the leads have been fired. Material Fact No. 6. The two Norman officers are giving G. Morris verbal commands to put his hands behind his back, but Morris is not complying. Officer Shelton tries grabbing Morris's arm to handcuff him but Morris resists, refusing to allow his arms to be placed behind his back. Material Fact No. 7. At time marker 22:38, Idlett jumps

over the center barrier wall and immediately begins trying to grab Morris's arm. Idlett and Shelton attempt to place Morris into handcuffs, but he continues to resist and they are unable to place the handcuffs on him. Material Fact No. 8. Even when an officer has greater strength than an arrestee, it is often very difficult to pull an arrestee's arm out from under him if he is on his stomach and pulling his arm in towards his body – as Morris was doing in this situation. The problem is made worse when the arrestee is on methamphetamine – which Morris was. Material Fact No. 9.

Officer Lancaster could see that Shelton and Idlett were having great difficulty handcuffing Morris. Officer Lancaster yells that he is going to cycle his taser again. At approximately the 23:10 marker on the video, Shelton and Idlett release Morris and Lancaster cycles his taser. One of the leads of the taser had come out of Morris's body – likely during the attempt to handcuff him -- and is now lying on the pavement. However, the taser does have some effect and momentarily stops Morris from resisting during the period in which the taser is cycling. Material Fact No. 10.

Clearly, Lancaster's second use of his taser was justified. Morris is not following verbal commands to place his hands behind his back and he is actively resisting when Shelton and Idlett attempt to pull his arms behind his back in order to handcuff him. Use of a taser against an arrestee who is resisting arrest has always been reasonable. *See e.g. Hinton v. City of Elwood, Kan.*, 997 F.2d 774 (10th Cir. 1993) (using a stun gun multiple times on a suspect who is resisting arrest is reasonable even when the suspect is being arrested for a

minor misdemeanor and the suspect poses no immediate threat to the police or public); *Draper v. Reynolds*, 369 F.3d 1270 (11th Cir. 2004) (using a taser is reasonable when the suspect does not follow the officer's commands); *Carpenter v. Gage*, 686 F.3d 644, 649-50 (8th Cir. 2012) (multiple taser cycles do not violate the Fourth Amendment when suspect continues to resist); *Williams v. Sandel*, 433 Fed.Appx. 353 (6th Cir. 2011) (repeated use of tasers, batons, and pepper spray was objectively reasonable). In addition, the situation was extremely dangerous because it was occurring in the inside shoulder of a busy interstate highway at 2:00 AM in the morning with cars zipping by. *See Mecham v. Frazier*, 500 F.3d 1200 (10th Cir. 2007) (resistance and safety concerns associated with proximity to a busy interstate highway warranted use of pepper spray even where the crime involved was a minor misdemeanor). G. Morris was already on the ground so there was little risk of Morris falling and injuring himself as a result of the taser use.

Given all the facts and circumstances, it would have arguably been unreasonable for Lancaster *not* to attempt to use his taser to take Morris into custody in this situation. Other arguably justifiable uses of force would have been more dangerous to G. Morris than using the taser. Delivering physical strikes to Morris's body with hands, feet, or batons – although reasonable under these circumstances – would have caused more trauma to Morris's body than using the taser. Material Fact No. 28. In addition, grabbing G. Morris around the neck in an attempt to slow the blood flow to Morris's brain – while not lethal if done properly – is obviously more dangerous than using a taser. *Id.* And finally, shooting Morris with a

firearm would obviously have posed much greater risk of death or permanent injury than use of the taser. *Id.* Thus, Lancaster's taser use was a very conservative and reasonable use of force under the facts of this case.

Lancaster's third use of his taser was justified for the same reasons as the other two uses of his taser. After the second taser use, but prior to the third taser use, Shelton, Hicks, Lancaster, and Idlett tried again to handcuff Morris without success. Material Fact No. 11-12. First, they waited for the taser to finish cycling from its second use before attempting to touch Morris again. Material Fact No. 11. Otherwise, they could have been adversely affected by the taser's electricity. *Id.* As soon as the taser finished cycling from its second use, Shelton, Hicks, and Idlett again begin attempting to handcuff Morris. This occurs at approximately the 23:18 time marker on the video. *Id.* Shelton, Hicks, Lancaster, and Idlett are still unable to handcuff Morris because they still cannot not pull both of his arms behind his back to get the handcuffs on him. Material Fact No. 12. At one point Officer Hicks attempts to use his baton as a pry bar to pull Morris's arm out from under him. Morris's muscle tone is very rigid however and he is not complying with any verbal orders. He does not even seem to feel anything or realize that he is injured or naked. During this time Morris is screaming in a very violent tone of voice "shoot me." Morris is also kicking aggressively and continues pushing himself towards the fast lane of Interstate 35. Material Fact No. 12. The shoulder in this area is approximately 13 feet, 8 inches wide. *Id.* Morris makes it partially over the white line separating the shoulder from the fast lane of traffic. *Id.* The fact that

Morris makes it from the center barrier wall to the white line separating the shoulder from the highway shows how forcefully he was struggling. *Id.* By this time, even assuming – counterfactually – that the officers were somehow mistaken about Morris's continued resistance – which they were not – it still would not have been unreasonable to use the taser. *See Abbott v. Sangamon County, Ill.*, 705 F.3d 706, 728 (7th Cir. 2013) ("even assuming that Travis had ceased resisting prior to these last three tasings, Deputy Sweeney reasonably could have believed that Travis had not ceased resisting).

As he is going into the highway, Officer Shelton and Trooper Idlett grab Morris's arms to stop him from going all the way into the lane of travel. Material Fact No. 13. Officer Lancaster then uses his taser in drive stun mode in an attempt to gain control of Morris. *Id.* The taser is not very effective this third time. However, at approximately the 24:30 marker on the video, Shelton and Idlett are able to pull G. Morris's arms back enough to place handcuffs on him. Morris continues to resist the entire time, including while being handcuffed. Material Fact No. 14.

Based on the foregoing, Officer Lancaster's third use of his taser was clearly justified. Not only was Morris still forcefully resisting at the time of Lancaster's third use of his taser, but Morris had made his way to the line separating the shoulder from the fast lane of traffic. At this point the officers were justified in doing whatever was necessary to get Morris under control and into custody. *See Plumhoff v. Rickard*, 134 S.Ct. 2012 (2014) (shooting suspect dead in order to prevent from returning to highway where he could have endangered

motorists was reasonable).

### 2. Handcuffing

As for Shelton and Lancaster's eventual securing of Morris's arms and placing him in handcuffs, it cannot seriously be disputed that this was reasonable. Unless handcuffs are placed in such a manner as to cause more than de minimis injury, handcuffing is always reasonable when an arrest is made. *See Koch v. City of Del City*, 660 F.3d 1228 (10th Cir. 2011) (even where offense was a nonviolent misdemeanor and the arrestee did not present any immediate threat, handcuffing was reasonable). The handcuffing in the case at bar came at the end of a dangerous struggle. There is no allegation nor is there any evidence that the handcuffing was unwarranted or that the actual handcuffing itself was done in excessively forceful manner. Handcuffing is always reasonable in these circumstances. *See G.M. ex rel. B.M. v. Casalduc*, 982 F. Supp. 2d 1235 (D.N.M. 2013) (handcuffing is appropriate in nearly every situation where an arrest is authorized).

### 3. Leg Restraints

As for Idlett's decision to place leg restraints on Morris, this action was clearly justified under the facts and circumstances of the situation. At time marker 24:46 on the video, Trooper Idlett radioed the dispatcher that G. Morris was in custody. Material Fact No. 19. Immediately thereafter, Trooper Idlett observed that G. Morris was still kicking and pushing with his feet and legs. *Id.* Because G. Morris had previously tried to push himself into the fast lane of I-35, Trooper Idlett decided to retrieve his leg restraints and place them

on G. Morris. *Id.* At time marker 25:36, on the video, Trooper Idlett jumped back over the concrete barrier to retrieve leg restraints from his vehicle. Material Fact No. 20. After retrieving the leg restraints, Trooper Idlett went back to Morris and placed the leg restraints on Morris by fastening the ends to Morris's ankles. *Id.* At no point were the leg restraints ever connected to the handcuffs or to anything else other than Morris's ankles. *Id.* Under these circumstances, the use of leg restraints is not a Fourth Amendment violation. *See Mayard v. Hopwood*, 105 F.3d 1226 (8th Cir. 1997) (use of leg restraint on arrestee who is kicking is reasonable); *Gunter v. Township of Lumberton*, 535 Fed. Appx. 144, 148 (3rd Cir. 2013) (same); *Cf. Cruz v. City of Laramie, Wyo.*, 239 F.3d 1183 (10th Cir. 2001) (restraint is unreasonable if arestee is "hog-tied," i.e., if ankles and wrists are bound together behind the back with 12 inches or less of separation). In the case at bar, Morris's ankles and wrists were not bound together at all, much less bound together with less than 12 inches of separation. Here, the use of the leg restraints on Morris was even more justified by the danger that Morris would somehow make his way into traffic. In *Plumhoff v. Rickard*, 134 S.Ct. 2012 (2014), officers were justified in shooting the arrestee to prevent him from returning to the highway where they reasonably believed that he would pose a danger to other motorists. If it was reasonable to shoot Plumhoff in order to prevent him from returning to the highway then certainly it was reasonable to put leg restraints on Morris in order to ensure that he could not get into the highway where he could put other motorists at risk.

### 4.    Miscellaneous Injury Reference

Finally, as for Morris's vague allegation that "the officers" caused the injuries depicted in six photos which are copied onto the removed petition at page 5, paragraph 21, the removed petition does not allege which of the officers allegedly caused these injuries. Nor does the removed petition state how the officers allegedly caused the injuries depicted. G. Morris had already been in an automobile accident. He had already been fighting with the Norman officers. And he had already been tased by Officer Lancaster before Trooper Idlett arrived. Thus, the removed petition is insufficient to state a claim against Trooper Idlett under the pleading standards of Fed. R. Civ. P. 8. *See Robbins v. Oklahoma*, 519 F.3d 1242, 1250 (10th Cir. 2008) ("the complaint must make clear exactly *who* is alleged to have done *what* to *whom*").

In addition, even if all of G. Morris's injuries occurred after Trooper Idlett arrived, it is undisputed that the officers did nothing to cause the injuries other than attempt to take G. Morris into custody in the manner outlined in the material facts section of this brief. It is also undisputed that at no time did Trooper Idlett ever deliver any strikes, blows, kicks, or stomps of any kind to G. Morris. Material Fact No. 22. And, at no time did Trooper Idlett observe the other officers delivering any strikes, blows, kicks, or stomps of any kind to G. Morris. *Id.* In addition, in light of the fact that G. Morris was naked, in light of the fact that he had fallen as a result of Lancaster's taser use which occurred prior to Idlett's arrival, and in light of the fact that G. Morris was struggling with the officers on the pavement while he was naked, there is no reason to believe that G. Morris's injuries came from some phantom

use of excessive force by Idlett. In fact, as for any injuries which occurred after Trooper Idlett arrived, there is no reason to conclude that G. Morris's injuries came from any source other than G. Morris's own violent thrashing, fighting, and dragging himself along the pavement during his fight with the officers. *See* Material Fact No. 15 ("Morris's injuries were from his violent thrashing, fighting, and dragging himself along the pavement.")

**5.    No Positional Asphyxia**

Before concluding the excessive force section of this brief, it should be noted that Morris has not alleged that G. Morris suffered any type of asphyxia or that he was injured by being placed in any illegal position. Thus, there is no basis for the Court to find that Morris has even attempted to state a claim for positional asphyxiation. *Cf. Gunter v. Township of Lumberton*, 535 Fed. Appx. 144, 148 (3rd Cir. 2013) (there could be no claim for excessive force based on a positional asphyxia where the cause of death is not positional asphyxia).

For all of these reasons, Trooper Idlett must be granted summary judgment on all of Morris's Fourth Amendment excessive force claims.

**VI.    Use of Force Under the Oklahoma Constitution**

Article 2, Section 30 of the Oklahoma Constitution mirrors the Fourth Amendment of the U.S. Constitution. It provides that: "[t]he right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches or seizures shall not be violated". There are two state cases which discuss § 30 in the context of a private action for excessive force. The first is *Bryson v. Oklahoma County Detention Center*, 261 P.3d 627

(Okla. App. 2011). In that case, the plaintiff sued Oklahoma County alleging that a detention officer at the county jail had used excessive force against him in violation of the state constitution. The county filed a motion for summary judgment admitting that the detention officer's "use of force was excessive," *id.* at 635, but arguing that the county was immune from liability under Okla. Stat. tit. 51, § 155 for the "[p]rovision, equipping, operation or maintenance of any prison, jail or correctional facility....". *Id.* at 639. The court rejected the county's argument and instead held that § 155 was no defense to an excessive force claim under § 30. The court also adopted the "reasonableness test" of *Graham* for analyzing excessive force claims under § 30. *Id.* at 638. However, because it was focused only on the county's immunity argument under the Governmental Tort Claims Act with respect to the state constitutional claim, the court did not have an opportunity to apply the *Graham* reasonableness standard to the facts of the case.

Later, in *Bosh v. Cherokee County Bldg. Authority*, 305 P.3d 994 (Okla. 2013), the Oklahoma Supreme Court confirmed that § 30 did indeed create a private cause of action for excessive force. However, because it was merely answering specific certified questions from a federal court, the Court did not have the an opportunity to set forth the standard which it would apply in evaluating excessive force claims under § 30.

Although *Bosh* did not construe § 30 in such a way as to establish a definite standard which the Court would apply to determine whether a certain use of force would be considered "excessive," it is safe to conclude that the Oklahoma Supreme Court would

follow a standard very similar – if not identical – to the standard used by the U.S. Supreme Court in construing the Fourth Amendment. *Bryson* already announced that it would follow the *Graham* reasonableness standard. *Bryson*, 261 P.3d at 638. And the Oklahoma Supreme Court has previously looked to federal case law interpreting the Eighth Amendment when construing Okla. Const. art. 2, § 9 -- which is Oklahoma's analog to the Eighth Amendment. *See Washington v. Berry*, 55 P.3d 1036 (Okla. 2002). Thus, Trooper Idlett is entitled to summary judgment on Morris's § 30 claims for the same reasons that he is entitled to summary judgment on Morris's federal constitutional claims.

Even if the Oklahoma Supreme Court were to decide that § 30 claims should be evaluated differently than Fourth Amendment claims in some cases, the case at bar is not the case where such a distinction is going to matter. Here, Morris has not even stated a viable claim for negligence, much less a constitutional violation under any standard. Also, although it was not explicitly construing § 30, the Oklahoma Supreme Court has stated that where a lawful arrest is made, the person making the arrest is generally not liable in damages to the person arrested except in "an exceptional case where there is a strong showing of excessive and unreasonable force . . .". *Hulls v. Williams*, 29 P.2d 582 (Okla. 1934). Clearly the case at bar is not such an "exceptional case." Accordingly, Trooper Idlett is entitled to summary judgment on Morris's § 30 excessive force claim.

## VII.   Deliberate Indifference to Medical Need

In order to overcome summary judgment, Morris must show that G. Morris was

injured as a result of Trooper Idlett's "deliberate indifference" to G. Morris's serious medical need. *Mann v. Taser Int'l, Inc.*, 588 F.3d 1291, 1306-7 (11th Cir. 2009). Mere negligence or a mistake in judgment does not rise to the level of deliberate indifference. *Id.* at 1308. Deliberate indifference is a subjective standard of liability consistent with recklessness as that term is defined in criminal law. *Gunter v. Township of Lumberton*, 535 Fed.Appx. 144 (3rd Cir. 2013).

Trooper Idlett did not act with deliberate indifference in this case. When he arrived, Norman police officers were already struggling with G. Morris. Trooper Idlett almost immediately began to assist them in their attempts to take G. Morris into custody. Even assuming, arguendo, that no one had called emergency responders before Trooper Idlett arrived, Trooper Idlett would not have known this. Trooper Idlett was aware that the Norman Police Department was a sophisticated urban law enforcement agency and it would have been objectively reasonable for him to have believed that someone from the City of Norman had already requested medical assistance. In any event, as soon as Trooper Idlett and the Norman officers were able to get Morris into handcuffs, i.e. shortly after the 24:30 timestamp on the video, Trooper Idlett asked the Norman officers if they needed to start medical. Material Fact No. 18. One of the Norman officers advised him that medical had already been called and was on its way. *Id.* Trooper Idlett had no reason to doubt that this was true and there is no evidence that this was not true. In any event, the first responders arrived at the 28:56 mark on the video. Material Fact No. 24. Under these facts, Morris has not even stated a claim for

negligence, much less a constitutional violation. For these reasons, summary judgment must be granted to Trooper Idlett on all of Morris's constitutional claims – state and federal – arising from any allegation that Trooper Idlett denied G. Morris access to medical care.

## VIII. Qualified Immunity

### A. Federal Constitutional Claims

Even assuming, arguendo, that G. Morris's constitutional rights were violated, Trooper Idlett is still entitled to summary judgment because Trooper Idlett did not violate any *clearly established* right. In order be liable, an official must have violated a "clearly established" right. *Saucier v. Katz*, 533 U.S. 194, 202 (2001), receded from on other grounds by *Pearson v. Callahan*, 129 S.Ct. 808 (2009). In addition, even if the Court were to find, arguendo, a violation of a clearly established right to be free from taser use as applied in this case, Trooper Idlett would still be entitled to immunity because he did not carry a taser, had no taser training, and had never – up until the incident which is the subject of this case – worked with other officers in a situation in which the other officers had used a taser. Material Fact No. 26. Thus, Trooper Idlett had no reason to know the relevant legal standards applying to taser usage. Where an officer neither knows nor has reason to know a certain relevant legal standard, the defense of qualified immunity should be sustained – even if the standard is clearly established. *See Harlow v. Fitzgerald*, 457 U.S. 800, 819 (1982) (indicating that the defense of qualified immunity should be sustained when the official shows that he neither knew nor should have known of the relevant legal standard). For these reasons, Trooper Idlett is entitled to summary judgment.

### B. State Constitutional Claims

Under common law, public officers were protected from tort liability while performing discretionary functions. *Neal v. Donahue*, 611 P.2d 1125, 1129 (Okla. 1980). There is no reason that similar protections should not apply to state constitutional claims as well. *See e.g. Fleming v. City of Bridgeport*, 935 A.2d 126, 147-48 (Conn. 2007) (recognizing common law qualified immunity as a defense to state constitutional claims); *Moresi v. State Through Dept. of Wildlife and Fisheries*, 567 So.2d 1081, 1094 (La. 1990) ("If the defendant shows that the state constitutional right alleged to have been violated was not clearly established, the defendant is entitled to qualified immunity."); *Tiscareno v. Anderson*, 639 F.3d 1016, 1025 (10th Cir. 2011) (test for damages claim under Utah Constitution requires showing that defendant violated a "clearly established" right and is analyzed identically to the clearly established prong of the federal qualified immunity test), vacated in part on other grounds by *Tiscareno v. Anderson*, 421 Fed.Appx. 842 (10th Cir. 2011) (unpublished op.).

In the case at bar, Trooper Idlett is entitled to qualified immunity because he was acting in good faith, in the course and scope of his employment, and he did not violate any clearly established right of G. Morris. *See* Material Fact No. 39 ("Idlett was acting in good faith in the course and scope of his employment").

## CONCLUSION

Wherefore, Trooper Jansen Idlett respectfully requests that this Court enter summary judgment in his favor on all of Morris's claims against him.

Respectfully submitted:

s/Devan A. Pederson
**DEVAN A. PEDERSON, OBA # 16576**
Assistant Attorney General
Oklahoma Attorney General's Office
Litigation Section
313 N. E. 21st Street
Oklahoma City, Oklahoma  73105
Tele: (405) 521-3921   Fax: (405) 521-4518
Devan.Pederson@oag.ok.gov
*Attorney for Defendants, Jansen Idelett and*
*Department of Public Safety ex rel*
*Oklahoma Highway Patrol*

## CERTIFICATE OF MAILING

I hereby certify that on October 1, 2014, I electronically transmitted the foregoing document to the Clerk of Court using the ECF System for filing.  Based on the records currently on file, the Clerk of Court will transmit a Notice of Electronic Filing to the applicable ECF registrants:

Rickey J. Knighton, II
rick.knighton@normanOK.gov

Kristina L. Bell
kristina.bell@normanOK.gov

Amber N. Peckio Garrett
D. Mitchell Garrett
mitchell@garrettlawcenter.com

s/Devan A. Pederson
Devan A. Pederson
