## STATEMENT OF TROOPER JANSEN IDLETT

1. I, Jansen Idlett, am employed by the Oklahoma Highway Patrol Division of the Department of Public Safety as a Highway Patrol Trooper. I began serving as a Trooper in August of 2005.

2. In the early morning hours of Sunday, December 16, 2012 I was on duty patrolling Cleveland and McClain Counties. At or around 1:55 AM, I stopped a motorcyclist on the northbound side of I-35 in Norman, Oklahoma.

3. In my patrol vehicle, I have an audio-video recording device which is activated when I turn on my overhead lights. When the lights are activated the recording device is designed to capture and permanently record video beginning from the time period approximately one minute prior to the activation of the lights and continuing until the camera is turned off.

4. When I activated my lights to pull over the motorcyclist, the recording equipment in my patrol unit was activated and captured 38 minutes and 23 seconds of video beginning approximately one minute before I activated my lights until I turned off the video upon arriving at the Cleveland County Jail. The video recorder was active and recording during the entire time period of my encounter with George Morris.

5. I have reviewed the video and it is a true and correct depiction of the events which occurred on December 16, 2012. The video is continuous and contains no gaps, edits, or alterations.

EXHIBIT 5

6.       At time marker 1:06 on the video, I pulled over a motorcyclist. At time marker 7:30, I arrested the motorcyclist. At time marker 17:48, the wrecker arrived to impound the motorcyclist's motorcycle. At time marker 20:10, I left the site where I had stopped the motorcyclist.

7.       At time marker 20:16 on the video, the dispatcher radioed me requesting that I call her on my cell phone. At time marker 20:42, I pulled over and called the dispatcher. The dispatcher told me that there was a reported auto accident on I-35 around Robinson in which one of the drivers was naked. At time marker 20:58, I advised the dispatcher that I was at Robinson and that I did not see anything. I then noticed flashing lights to the north and so advised the dispatcher. At time marker 21:12 I resumed traveling northbound on I-35.

8.       At time marker 22:16 on the video, I observed two Norman police vehicles with their lights activated which were stopped on the side of the road on the southbound side of I-35 just north of Rock Creek Road. At time marker 22:24, I parked next to the center barrier on the northbound side of the interstate to see why the Norman officers were stopped. I exited my vehicle and looked over the top of the center barrier. There I observed a naked white male (George Morris) lying on the inside shoulder of the interstate on the southbound side. There is no way that Morris could have gotten to this spot on foot without crossing three lanes of traffic. I could see that Officer Lancaster had already used his taser because I could see that the leads had been fired. The two Norman officers were giving Mr. Morris verbal commands to put his hands behind his back, but

Morris was not complying. Officer Shelton tried grabbing Morris's arm to handcuff him but Morris resisted, refusing to allow his arms to be placed behind his back.

9. At time marker 22:38, I jumped over the center barrier wall and immediately began trying to grab Morris' other arm. We attempted to place Morris into handcuffs, but he continued to resist and we were unable to get him into handcuffs. Even when an officer has greater strength than an arrestee, it is very difficult to pull an arrestee's arm out from under him if he is on his stomach and pulling his arm in. This is especially true when the arrestee has been using amphetamines.

10. Officer Lancaster could see that Officer Shelton and I were having great difficulty handcuffing Morris. He then told us that he was going to cycle his taser again. At approximately the 23:10 marker on the video, Officer Shelton and I broke away from Morris and Officer Lancaster cycled his taser. One of the leads had come out of Morris's body and was lying on the pavement, but the taser did momentarily stop Morris from resisting during the period in which the taser was cycling.

11. As soon as the taser finished cycling, Officer Shelton, Officer Hicks, and I again began attempting to handcuff Morris. This occurred at approximately the 23:18 time marker on the video. We had to wait for the taser to finish cycling or else we could have been affected by the taser's electricity. We were still unable to handcuff Morris. We could not pull both of his arms behind his back long enough to get the handcuffs on him. Morris' muscle tone was very rigid. He did not comply with any verbal orders and did not seem to feel anything or realize that he was injured and naked. During this time Morris

began screaming in a very violent tone of voice "shoot me." Morris was also kicking aggressively and began pushing himself towards the fast lane of Interstate 35. The shoulder in this area is approximately 13 feet, 8 inches wide. Morris made it partially over the white line separating the shoulder from the fast lane of traffic. The fact that Morris was able to make it from the center barrier wall to the white line separating the shoulder from the highway shows how forcefully he was struggling.

12. As he was going into the highway, Officer Shelton and I grabbed Morris' arms to stop him from going all the way into the lane of travel. At this time Officer Lancaster used his taser in drive stun mode in an attempt to gain control of Morris. Finally, at approximately the 24:30 marker on the video, Officer Shelton and I were then able to get handcuffs on Mr. Morris' right hand first and then on his left hand. Morris continued to resist while we were handcuffing him. By this time Morris had cuts and scrapes on his body and was bleeding. It appeared to me that these injuries were from his violent thrashing, fighting, and dragging himself along the pavement.

13. I have listened to the interview of Officer Aaron Lancaster which was submitted with his motion for summary judgment. Officer Lancaster said in his interview that he used his taser twice with the leads and once in drive stun mode. Interview of Aaron Lancaster at 9:42. Officer Lancaster's first use of the taser occurred prior to my arrival because when I arrived I could see that the leads had already been deployed from his taser.

14. In reviewing the video I noticed that a third Norman police unit can been seen approaching at time marker 22:48. Based on my review of the video and on the recorded interviews of Officers Shelton, Lancaster, and Hicks, which were submitted in support of their motions for summary judgment, I believe that this vehicle is that of Officer Hicks.

15. Morris was placed in handcuffs at approximately the 24:30 mark on the video. As soon as Morris was handcuffed, I asked the Norman officers if we needed to start medical. One of the Norman officers advised that medical had already been started.

16. At 24:46, I radioed the dispatcher that the subject was in custody. I then observed that Morris kicking and pushing with his feet and legs. Based on Morris' previous actions of trying to kick and push himself into the fast lane of I-35, I decided to use my leg restraints on Morris.

17. At 25:36, I jumped back over the concrete barrier to retrieve the leg restraints from my vehicle. After retrieving the leg restraints, I went back to Morris and placed them on his ankles. At no point were the leg restraints ever connected to the handcuffs or to anything else other than Morris' ankles.

18. At no time during the entire incident did I ever place my weight on Morris' back. At no time did I ever observe the Norman Officers placing their weight on Morris' back. At no time did I deliver any strikes or blows of any kind to Morris. At no time did I observe the Norman Officers delivering any strikes or blows of any kind to Morris.

19. At some point after I had placed the leg restraints on Morris' ankles, I

placed my hand on Mr. Morris' back to feel his heart beat. When I did this, I could feel his heart beating very rapidly. I could also see and feel him breathing. He was also moaning. When I placed my hand on Morris's back, I did not apply any pressure and I certainly did not put any of my body weight on his back.

20. At the 27:08 marker on the video, the emergency lights from the first responders can been seen as the first responders approached the site. At the 28:56 marker, the first responders arrive on scene.

21. At the 32:14 marker, I returned to my vehicle and proceeded on to the Cleveland County Jail to transfer custody of the motorcycle driver whom I had arrested prior to the Morris incident.

22. I later learned that Morris had expired at Norman Regional Hospital at 3:32 AM.

23. Although I technically had probable cause to arrest Morris for various offenses, such as resisting an executive officer in violation of Okla. Stat. tit. 21, § 268, outraging public decency in violation of Okla. Stat. tit. 21, § 22, intoxication on a public road in violation of Okla. Stat. tit. 37, § 8, or leaving the scene of an accident in violation of Okla. Stat. tit. 47, § 10-103, my focus was not on criminal law enforcement. Instead, my focus was on assisting the Norman Officers in subduing Mr. Morris quickly and safely for the purpose of protecting Morris and the passing motorists from the immediate risk that Morris would make his way into traffic on the Interstate and cause an accident. I also wanted to assist the Norman Officers to make sure that they were able to secure

Morris in a manner that would not injure them or injure Morris.

24. The speed limit at the location where Morris was taken into custody was 60 miles per hour. During the time that I was stopped to assist the Norman officers in subduing Mr. Morris, multiple vehicles passed by us in both the north and south bound lanes.

25. Even if Morris were not in the immediate vicinity of a public roadway, it would still have been appropriate to take Morris into custody for his own protection due to his severely diminished mental state.

26. I have never received formal training in the use of tasers. I do not carry a taser. The Morris incident was the first time that I had assisted other officers on an occasion where they had to use a taser.

27. Although I do not have formal taser training, I do understand how tasers work in general and I know that they are routinely used by municipal police departments. Based on my knowledge of tasers, I believe that Officer Lancaster's use of his taser was appropriate due to the extreme danger posed by Morris's resistance to being taken into custody. At the time of Officer Lancaster's taser use – on the two occasions which I observed – Morris was already on the ground. Thus, he had no risk of injury from falling. Officer Lancaster's two uses of his taser which I observed had less probability of causing injury to Morris than other methods of gaining compliance such as: (1) delivering physical strikes to Morris' body with hands feet or batons, (2) attempting to slow the blood flow to Morris' brain by grabbing him around the neck, or (3) shooting Morris. To

the best of my knowledge and belief, using the taser had less probability of causing injury to Morris than these other techniques. I cannot stress strongly enough that the situation which Morris put us in was rapidly developing and dangerous.

28.   During the entire time after I arrived, Morris posed a threat of getting into the roadway, resuming his fight with the officers, and endangering innocent motorists. Even once he was handcuffed, Morris continued to struggle. Even after he took a break from struggling, there was no way to know if he would resume his attempts to fight, escape, crawl or roll into traffic, etc.

29.   At no time after Morris was handcuffed was he left alone. At least one officer constantly monitored him until the first responders arrived and began treating him. At no time prior to the first responders' arrival did I observe Morris stop breathing or hear anyone else state that Morris had stopped breathing.

30.   It is not safe to be stopped in the inside shoulder or in the fast lane of an Interstate highway after dark. There is always the risk of being struck by an intoxicated or inattentive driver. It was important for us to get Morris into custody so that he could be taken by an ambulance as soon as possible so that we – and Morris -- could get out of the inside shoulder of the highway.

31.   At all times during my encounter with G. Morris, I was acting in good faith in the course and scope of my employment as a Highway Patrol Trooper for the Oklahoma Highway Patrol division of the Department of Public Safety.

      The foregoing statements are based upon my personal knowledge, unless stated otherwise, and are true and correct and made under penalty of perjury.

*[signature]* #512

Trp. Jansen Idlett, #512
Oklahoma City, OK
September 10, 2014